## UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNIVERSAL HOSPITAL SERVICES, INC. | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No.:   5:15-cv-32 |
| | ) | |
| vs. | ) | |
| | ) | |
| HILL-ROM HOLDINGS, INC.; HILL-ROM | ) | JURY TRIAL DEMANDED |
| COMPANY, INC.; HILL-ROM SERVICES, | ) | |
| INC. | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S ORIGINAL COMPLAINT

This action is brought by Plaintiff Universal Hospital Services, Inc. ("Universal") to preserve choice in the medical equipment rental industry and prevent a serial monopolist and violator of the antitrust laws, Defendants Hill-Rom Holdings, Inc., and its wholly-owned subsidiaries Hill-Rom Company, Inc. and Hill-Rom Services, Inc. (collectively, "Hill-Rom"), from destroying competition in the industry by engaging in a variety of anti-competitive practices that have previously been subject to an injunction and resulted in the payment of over half a billion dollars by Hill-Rom to competitors, hospitals, and healthcare providers. The gravamen of the complaint is that Hill-Rom has reverted to its old ways now that the injunction has expired and is again using its monopoly power in the standard hospital bed market and a variety of anti-competitive tactics, including exclusive dealing and bundled discounts, in an attempt to monopolize the rental markets for patient handling equipment ("PHE") and moveable medical equipment ("MME"). In addition, Universal also seeks to prevent Hill-Rom from tortiously interfering with its asset management service programs. Plaintiff demands a jury trial pursuant to Rule 38 of the Federal Rules of Civil Procedure and seeks injunctive and monetary

relief; treble and punitive damages; pre- and post-judgment interest; and its attorneys' fees and costs in bringing this action.

In support of these claims, Universal alleges based upon its own personal knowledge and information and belief as follows:

## THE PARTIES

1.       Universal is a corporation organized under the laws of Delaware with its principal place of business at 6625 West 78th Street, Suite 300, Minneapolis, Minnesota, 55439.  Universal is a leading provider of PHE and MME rentals and, for more than 75 years, it has delivered medical equipment management and service solutions that help clients reduce costs, increase operating efficiencies, improve caregiver satisfaction and support optimal patient outcomes. It owns or manages more than 700,000 pieces of medical equipment for over 8,000 national, regional and local acute care hospitals and alternate site providers in all 50 states.  Universal regularly transacts business in the State of Texas and this judicial district through interstate commerce.

2.       Hill-Rom Holdings, Inc. is a corporation formed and existing under the laws of the State of Indiana, with its principal place of business at 1069 State Route 46 East, Batesville, Indiana 47006.  Hill-Rom Holdings, Inc. is a worldwide manufacturer and provider of medical technologies and related services for the health care industry, including the manufacture, sale, and/or rental of standard hospital beds and PHE and MME products to medical providers through interstate commerce.  It regularly transacts business in the State of Texas and this judicial district through interstate commerce.  It may be served with process by serving its registered agent:  CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201.

3.     Hill-Rom Company, Inc. is a wholly-owned subsidiary of Hill-Rom Holdings, Inc. and is a corporation formed and existing under the laws of the State of Indiana, with its principal place of business at 1069 State Route 46 East, Batesville, Indiana 47006. It regularly transacts business in the State of Texas and this judicial district through interstate commerce. It may be served with process by serving its registered agent: CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201.

4.     Hill-Rom Services, Inc. is a wholly-owned subsidiary of Hill-Rom Company, Inc. and/or Hill-Rom Holdings, Inc., and is a corporation formed and existing under the laws of the State of Indiana, with its principal place of business at 1069 State Route 46 East, Batesville, Indiana 47006. It regularly transacts business in the State of Texas and this judicial district through interstate commerce. It may be served with process by serving its registered agent: CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201.

## JURISDICTION AND VENUE

5.     This action arises under the federal antitrust statutes and the statutory and common law of Texas. The alleged violations affect interstate commerce, as Hill-Rom operates in interstate commerce by contracting for the sale and rental of medical equipment across state lines.

6.     This court has subject matter jurisdiction pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a), 28 U.S.C. §§ 1331 and 1337, and 28 U.S.C. § 1367(a). Universal brings this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, to recover treble damages, equitable relief, costs of suit, and reasonable attorney's fees for Hill-Rom's violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, Section 3 of the Clayton Act, 15 U.S.C. § 14, and state law.

7.     This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(a), as the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states.

8.     This Court has personal jurisdiction over Hill-Rom pursuant to 28 U.S.C. § 1391 and Section 12 of the Clayton Act, 15 U.S.C. § 22, because, *inter alia,* (a) Hill-Rom regularly does business in the State of Texas, and (b) because it maintains an office, place of business, and/or agency for transacting business in the State of Texas.

9.     In addition, this Court has personal jurisdiction pursuant to Texas Civil Practice and Remedies Code § 17.042.

10.     Venue is proper in the United States District Court for the Western District of Texas, San Antonio Division,  pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b) and (c) because Hill-Rom resides, transacts business, is found, and has agents in this district, and because a substantial portion of the events giving rise to Universal's claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in the Western District of Texas.

11.     Specifically, Universal and Hill-Rom each have distribution centers and district offices located in the Western District of Texas, including in San Antonio, Austin, and Pflugerville.   Universal's largest Texas customer that was affected by Hill-Rom's anti-competitive conduct also has its principal place of business in San Antonio, Texas.

## NATURE AND STATE OF THE INDUSTRY

12.     Hill-Rom is the dominant global manufacturer of standard hospital beds and has maintained a 70-90% market share in the industry for the sale of standard beds in the United States since the 1990s.  Standard hospital beds typically have heavy-duty metal frames that can be adjusted to different positions by a hand-controlled electric motor; have adjustable side rails;

and contain a system that facilitates electronic communications from the bed to a nurse's station ("Standard Hospital Beds").

13.     Hill-Rom enjoys a monopoly in the sales market for Standard Hospital Beds. Hill-Rom's products are protected by a variety of patents, which it aggressively enforces, and hospital staffs are widely trained in the use of Hill-Rom's Standard Hospital Bed technology.

14.     Hill-Rom has built, extended, and maintained its monopoly power through a long history of anti-competitive actions, including illegal monopolization and exclusionary bundling practices.  Indeed, Hill-Rom has used its dominant market share in the Standard Hospital Bed market as a lever to gain market power in adjacent markets.

15.     In 1995, for example, Kinetic Concepts, Inc. ("KCI"), a competitor in the manufacture and rental of PHE products, filed a complaint alleging that Hill-Rom and its predecessor, Hillenbrand Industries, Inc. ("Hillenbrand"), committed similar anti-competitive conduct in an attempt to leverage its monopoly power in the Standard Hospital Bed market to gain control in a related PHE Rental market through exclusionary bundling practices. Specifically, KCI alleged that Hill-Rom conditioned large discounts on sales of its manufactured Standard Hospital Beds and headwall units on a commitment by group purchasing organizations ("GPOs") to rent specialty hospital beds (PHE products) from Hill-Rom exclusively for a period of five or more years.  In September 2002, a jury in the Western District of Texas returned a unanimous verdict in favor of KCI, finding that the Hill-Rom had violated Section 2 of the Sherman Act.  Hillenbrand eventually agreed to settle the case for $250 million.

16.     Following the KCI verdict and settlement, Spartanburg Regional Healthcare System sued Hill-Rom and Hillenbrand on behalf of hospitals and health care providers for damages arising from similar anticompetitive actions in 2003.  Spartanburg alleged that hospitals

and other healthcare providers had been illegally charged supra-competitive prices as a result of Hill-Rom's anticompetitive bundling of Standard Hospital Beds with the rental of specialty hospitals beds and other PHE products.  Hillenbrand and Hill-Rom ultimately settled with Spartanburg for $337.5 million.  As part of the settlement, Hill-Rom also agreed to a voluntary injunction that prevented Hill-Rom from leveraging its monopoly power in the market for the sale of Standard Hospital Beds into the market for the rental of certain patient handling equipment for three years by forcing Hill-Rom to unbundle and separately price and discount each product.

17.    The reprieve on the industry was short lived.  The *Spartanburg* injunction expired in 2009 just as Hill-Rom was bringing in new management and growth in the hospital equipment market began to slow.  As a result, Hill-Rom was confronted with a choice: compete on the merits of its PHE and MME products as a "new" Hill-Rom or return to its old anti-competitive practices with the ends being used to justify the means.  Ultimately, Hill-Rom chose recidivism.

18.    By mid-2013, Hill-Rom President and CEO John Greisch boasted to Wall Street investors that Hill-Rom's strategy was essentially to return to its old strategy of leveraging its monopoly to help bolster Hill-Rom's bottom line:

> One of the real strengths of the company that we're trying to leverage and we'll continue to leverage going forward is the market position that we enjoy, we've got over 70% install base market share in the [Standard Hospital Bed market], tremendous brand name and very, very strong market presence and brand equity within the acute care and post-acute care markets here in the United States and overseas.

19.    As part of this strategy, Greisch recognized that Hill-Rom's market power in the Standard Hospital Bed business presented Hill-Rom with the strategic opportunity to increase its market share in the rental markets for medical equipment by offering customers bundled deals on the sale of Standard Hospital Beds that "nobody else" could match.  Greisch candidly admitted

that Hill-Rom was "investing a lot of time and resources into making sure that we're selling the breadth of that portfolio[.]"

20.     This time, the primary targets of Hill-Rom's monopoly leveraging and exclusionary bundling strategy are the broader PHE and MME rental markets.  The PHE rental market includes standard hospital beds and a variety of specialty hospital bed systems and therapy surfaces that are used for patient lifting, transfer, movement, and care; it includes air suspension beds, rotating critical care air suspension beds, rotating treatment tables, air fluidized beds, and bariatric beds, all of which are designed for treatment of specific medical conditions such as burns, pressure ulcers, pulmonary complications, pain management, and obesity  ("PHE Rental").  The MME rental market includes portable medical equipment that is attached to a patient, such as infusion pumps, ventilators, sequential compressions devices, and vital signs monitoring equipment ("MME Rental").

21.     To effectuate Greish's strategy, Hill-Rom has started leveraging its market power in the Standard Hospital Bed market by negotiating sole-source agreements with national group purchasing organizations and hospital networks that contain steep discounts and rebates on the sale of Standard Hospital Beds bundled with ironclad commitments to use Hill-Rom for their PHE and MME Rental needs.  Hill-Rom knows that, no matter how efficiently or aggressively its competitors in the PHE and MME Rental markets price their products, competitors simply cannot compete with these steep bundled discounts because they do not sell Standard Hospital Beds.  Indeed, the bundled discounts and rebates Hill-Rom offers on Standard Hospital Beds are so steep and below the attributed cost of providing PHE and MME Rentals that there is no way for Hill-Rom's competitors to ever match them and remain in business, even if those competitors are more efficient providers of PHE and MME Rentals or provide a superior rental service.

22.     For example, Hill-Rom recently entered into three bundled, sole-source agreements with Hospital Corporation of America ("HCA"), HealthTrust Purchasing Group ("HPG"), and Providence Health.  Each of these agreements bundled steep discounts on PHE and MME Rental prices with substantial discounts and/or rebates on the sale of Standard Hospital Beds that are strictly contingent on sole-source commitments to use Hill-Rom for their members' PHE and MME Rental needs.

23.     The net result of this monopoly leveraging and exclusionary bundling strategy is Hill-Rom's rapid acquisition, growth, and expansion of market power in the adjacent PHE and MME Rental markets.  For example, Hill-Rom's exclusionary bundling deal with HCA and HPG allowed it to acquire exclusive access to at least an additional 12-15% of the national market for PHE and MME Rentals almost overnight.

24.     As its anti-competitive practices spread to additional GPOs, a tipping point will soon be reached.  And if Hill-Rom's strategy goes according to plan, it will soon dominate the PHE and MME Rental markets.

25.     If not enjoined immediately, therefore, Hill-Rom's anti-competitive actions will continue and force its competitors to leave the industry or downsize operations that are no longer profitable.  This will make it increasingly more difficult for competitors to compete for additional GPO contracts in the PHE and MME Rental markets, which typically require regional distribution, service, and logistics networks across the country to provide rental services within the time requirements specified by hospitals.  Furthermore, the competitors in these markets will be eliminated as a nascent potential threat to Hill-Rom's maintenance of its longstanding monopoly in the sales of Standard Hospital Beds.

26.     Once Hill-Rom forecloses competition in the PHE and MME Rental markets, it will be able to not only harm consumers by eliminating product choice but also by either charging supra-competitive prices for future rentals or eliminating the rental market altogether, thereby forcing hospital networks and individual hospitals to buy expensive equipment in advance instead of renting it to fit their needs.  The net result will be increased costs and prices, reduced output, and less choice in the health care system.  As a result, hospitals and other healthcare providers will be faced with higher costs and not be able to choose the best medical equipment for their patients.

27.     Universal therefore brings this action against Hill-Rom for its ongoing violation of federal and state antitrust laws in order to preserve choice and competition in the PHE and MME Rental markets for the benefit of hospitals and patients throughout the United States and to ensure lower costs, higher quality, and greater efficiency throughout the United States healthcare system.

## RELEVANT MARKETS AND MARKET POWER

28.     There are three relevant antitrust product markets in this case: the market for the sales of Standard Hospital Beds; the market for PHE Rentals; and the market for MME Rentals (collectively, the "Relevant Markets").

29.     Medical facilities purchase Standard Hospital Beds to cover their base needs.

30.     Generally, the PHE and MME Rental markets are distinct from the sales market for Standard Hospital Beds and play a critical role in supplying hospitals and other health care providers with needed medical equipment in certain situations.

31.     Hospital networks and individual hospitals typically rent PHE and MME products for several reasons, including the need to supplement existing equipment inventory (e.g.

additional PHE and MME equipment needed during winter flu season or due to a specific event, such as a hurricane) or the need for special equipment to accommodate certain patients (e.g. specific PHE equipment needed for bariatric patients or patients suffering from severe burns and other wounds).

32.     Many hospitals and other healthcare providers rent PHE and MME products on an as needed basis because it is prohibitively expensive for most medical facilities to buy and store PHE and MME products to cover all their potential needs.  This is particularly true if they only need the equipment for short periods of time as patient volume fluctuates and treatment needs vary.

33.     Hospitals and other medical facilities need PHE and MME Rentals on short-notice.  As a result, PHE and MME Rental agreements require suppliers to deliver medical equipment in a time-sensitive manner (e.g. within two to four hours, plus drive time, of the order being placed).  The small delivery windows in the PHE and MME Rental agreements have the practical effect of requiring suppliers to operate out of regional distribution networks that serve customers within approximately a 90-mile radius of the distribution center, also known as a district office.  This close proximity to customers allows suppliers to process, ship, and deliver medical equipment to customers in a time-sensitive manner, as it would take far too long to ship a product across the country to fill a customer's order.

34.     The provision of products and services to meet customers' rental and service demands requires well-developed, well-supplied, and accessible regional distribution networks. These networks require a significant investment of both time and money before they can be profitable and self-sufficient.  Once a company is foreclosed from a regional market and is therefore forced to downsize its distribution network, it would take years and significant

investment to rebuild it.  This creates a significant barrier to entry—or reentry—for the rental product markets.

35.     Finally, Standard Hospital Beds and PHE Rentals cannot be used interchangeably. Standard Hospital Bed purchases include generic and interchangeable beds that serve as the base need for all hospitals and medical facilities.  PHE Rentals, on the other hand, mostly include specialty beds and surfaces designed for specific patient conditions and needs that Standard Hospital Beds are not equipped to handle.  Oftentimes, PHE Rental orders are made after the patient arrives at the hospital, so suppliers must deliver the rental product specifically designed for that patient's condition on short-notice.

## The Sales Market for Standard Hospital Beds

36.     Hill-Rom manufactures Standard Hospital Beds and sells them to medical facilities in all 50 states, including this judicial district, through interstate commerce under supply agreements with GPOs, hospital associations, and integrated delivery networks ("IDNs").

37.     The Standard Hospital Bed market in the United States has annual sales exceeding $1 billion.   By its own admission, Hill-Rom currently accounts for at least 70% of the Standard Hospital Bed sales in the United States.  This substantial market share gives Hill-Rom monopoly power in the Standard Hospital Bed market.

38.     Universal does not manufacture Standard Hospital Beds.

39.     The relevant product market for Standard Hospital Beds covers a discrete set of products that are not interchangeable with other medical equipment, including PHE and MME Rentals.  Specifically, PHE Rentals, unlike Standard Hospital Beds, include specialty hospital beds that are four to five times more expensive than Standard Hospital Beds and designed to

11

meet specific patient-care needs. MME Rentals also cover a unique set of products that are not interchangeable with Standard Hospital Beds.

40.     The relevant geographic market for the sale of Standard Hospital Beds is the United States.

41.     There are substantial barriers to entry into the Standard Hospital Bed market, including the capital-intensive nature of the business; Hill-Rom's entrenched monopoly and reputation for anti-competitive tactics; Hill-Rom's patents and aggressive patent enforcement; standardization, and the retraining and switching costs arising from network effects; the extensive nature of the regulatory regime applicable to medical equipment; and the increasing need to have a global market presence to compete in any aspect of the market.

42.     Hospitals have invested substantial time and money into learning to use Hill-Rom's Standard Hospital Beds. As a result, they have become increasingly reluctant to adopt another manufacturers' technology, even if it has a better product or service. Thus, Hill-Rom's Standard Hospital Bed technology, and the patents that protect it, act as natural barriers to entry for suppliers looking to compete in the Standard Hospital Bed market.

## **PHE Rental Market**

43.     Defendant Hill-Rom manufactures PHE products and rents them to medical facilities in all 50 states, including this judicial district, through interstate commerce under rental agreements with GPOs, hospital associations, and IDNs.

44.     The PHE Rental market in the United States has annual rentals of at least $300 million. Hill-Rom is the dominant player in the PHE Rental market. It accounts for at least 35% of the PHE Rentals in the United States.

45.     Universal actively competes with Hill-Rom in the PHE Rental market by purchasing non-Hill-Rom beds to rent to its customers.

46.     The relevant product market for PHE Rentals covers a discrete set of products that are not interchangeable with other medical equipment, including the sale of Standard Hospital Beds and MME Rentals.

47.     The relevant geographic markets include the United States and, alternatively, regional submarkets within the United States.  The United States is the relevant geographic market for PHE Rentals that are not time-sensitive and/or where the costs associated with shipping equipment within the market on a timely basis are not cost-prohibitive.  Regional submarkets within the United States are the relevant geographic markets for PHE Rentals that are time-sensitive and/or where equipment can be moved profitably within the market on a timely basis.  These regional markets center around distribution centers owned and operated by Hill-Rom and Universal.  The geographic regions of each company closely overlap within each state, making either the state, or specific regions within larger states, relevant geographic markets for PHE Rentals.

**MME Rental Market**

48.     Defendant Hill-Rom rents MME products to medical facilities in all 50 states, including this judicial district, through interstate commerce under rental agreements with GPOs, hospital associations, and IDNs.

49.     The MME Rental market in the United States has annual rentals of $250-300 million across the industry.  Universal is currently a leading provider of MME Rentals in the industry, but it competes vigorously with Hill-Rom.  Due to Hill-Rom's anticompetitive conduct and bundled pricing, Hill-Rom is increasing its market share in the MME Rental market.

50.     The relevant product market for MME Rentals covers a discrete set of products that are not interchangeable with other medical equipment, including PHE Sales and PHE Rentals.

51.     The relevant geographic markets include the United States and regional submarkets within the United States.  The United States is the relevant geographic market for MME Rentals that are not time-sensitive and/or where the costs associated with shipping equipment within the market on a timely basis are not cost-prohibitive.  Regional submarkets within the United States are the relevant geographic markets for MME Rentals that are time-sensitive and/or where equipment cannot be moved profitably within the national market on a timely basis.  These regional markets center around distribution centers owned and operated by Hill-Rom and Universal.  The geographic regions of each company closely overlap within each state, making either the state, or specific regions within larger states, relevant geographic markets for MME Rentals.

## The Regional Geographic Markets

52.     Universal and Hill-Rom must be able to supply, service, and manage a full range of their products within each customer area on short notice pursuant to their PHE and/or MME Rental agreements.  This forces suppliers, such as Hill-Rom and Universal, to maintain regional distribution centers throughout the country to meet their customers' short-notice delivery demands.  Each regional distribution center is self-sufficient and operates independent of any other distribution centers in neighboring regions.

53.     As a result, competition between suppliers occurs on a regional level.  Hill-Rom and Universal each have distribution centers located in the same regional markets across the country that compete for the same groups of customers.   Given the short-notice delivery

constraints, these distribution centers cannot compete effectively for customers outside of their regional market.

54.     Each supplier must finance and develop its own regional supply chain to meet customers' rental and service needs.  Anticompetitive or exclusionary conduct that forecloses competition for even a few years in one regional market forces competitors to close or downsize operations in the regions that are not profitable.  This reduction has a direct effect on a competitor's long term ability to compete in the market since many GPO contracts are awarded based on a supplier's ability to quickly fill a customer's needs through its extensive distribution network.  A smaller, less-efficient distribution network will struggle to compete with a more developed one.

### The Importance Of The GPO Brokerage Services Market

55.     GPOs are comprised of various hospitals, IDNs, and individual physicians that collectively negotiate the terms and conditions for all medical equipment purchases and rentals on the behalf of their members.  In essence, GPOs function as a medical equipment supplier's gateway to customers.

56.     It is crucial for medical equipment suppliers to have access to GPO contracts to remain viable in the industry.  An estimated 96-98% of hospitals are GPO members and conduct their medical equipment purchases and rentals pursuant to a GPO supply agreement.  The six largest GPOs, including HPG, control an estimated 90% of all hospital medical equipment purchases and rentals across the country.

57.     There are no reasonably interchangeable substitutes for contracting with GPOs in the medical equipment rental industry.  A competitor in the PHE and MME Rental markets would incur higher contracting and marketing costs and lower sales if it could not compete in the

GPO brokerage services market and would quickly find itself out of business entirely.  Indeed, as Hill-Rom notes in its filings with the Securities and Exchange Commission, Hill-Rom's business, and that of its competitors, "is significantly dependent on major contracts with GPOs," and that any failure to be included in these agreements could have "a material adverse effect on its business, including capital and rental revenue."

58.     The GPOs use a bidding system for all medical equipment contracts and such bids are traditionally negotiated separately for each of the markets alleged herein.  For example, a GPO typically sends out separate bids for sales of Standard Hospital Beds, PHE Rentals, and MME Rentals.  As a result of Hill-Rom's exclusionary, anti-competitive behavior, however, GPOs have recently been incentivized to coordinate such bids together to take advantage of Hill-Rom's bundled discounts across markets.

59.     The bidding process for GPO contracts is staggered due to the various discrepancies in the duration of existing agreements and when such contracts come up for renewal.  Traditionally, GPO contracts come up for renewal and rebidding every three years.

60.     Furthermore, as a result of prior litigation, including the prior Hill-Rom litigation, most of the major GPO contracts have been multi-source or dual-source to preserve choice in the industry and avoid any antitrust concerns.  For example, by contracting with both Hill-Rom and Universal, GPOs are able to offer member hospitals a choice between competing service providers that provide different levels of services and equipment to meet each hospital's unique needs.

61.     GPO contracts are also traditionally tiered by commitment levels.  Special loyalty discounts, for example, are often available to hospitals who purchase a high percentage of

medical equipment rentals from suppliers approved under the GPO contract.  A hospital thus often has a strong incentive to remain "compliant" with GPO contracts.

62.     GPOs are compensated for their contracting services by the payment of administrative fees, typically a flat percentage.  In recent years, however, this compensation has been controversial and has drawn increased scrutiny because of a perception that GPOs have an incentive to award GPO contracts to the suppliers that will pay them the largest fees or offer other rewards, even if those service providers do not offer the lowest prices and/or the best products and services.

### THE IMPLEMENTATION OF HILL-ROM'S MONOPOLY LEVERAGING AND EXCLUSIONARY BUNDLING STRATEGY WITH GPOs AND HOSPITALS

63.     In recent years, Hill-Rom has been struggling with sluggish growth in its core business segment, namely the sale of Standard Hospital Beds.  Indeed, in its most recent filings with the Securities and Exchange Commission, Hill-Rom lamented the health care industry's "increased focus on hospital asset and resource efficiency" and warned that "capital spending for many of our products is on a long-term declining trend."  It also has recently explained decreased revenue in 2014 to investors by citing "the challenging and uncertain North American healthcare environment where there is continued pressure on capital spending."  Accordingly, Hill-Rom acknowledged that its business strategy going forward would be to diversify its product and service offering by making a greater push into adjacent markets.  If it could not do that, then Hill-Rom advised investors that its "market share, sales, and profitability could be adversely impacted."

64.     The prime target for Hill-Rom's future diversification and growth are the PHE and MME Rental markets.  Its strategy is to leverage its market power in the Standard Hospital Beds market to drive revenues in the adjacent PHE and MME Rental markets.  Hill-Rom's

President and CEO John Greisch confirmed this leveraging strategy in a recent discussion with Wall Street investors:

> One of the real strengths of the company that we're trying to leverage and we'll continue to leverage going forward is the market position that we enjoy, we've got over 70% install base market share in the [Standard Hospital Bed market], tremendous brand name and very, very strong market presence and brand equity within the acute care and post-acute care markets here in the United States and overseas.

As part of this strategy, Greisch recognized that Hill-Rom's market power in the Standard Hospital Bed business presented Hill-Rom with the strategic opportunity to increase its market share in the medical equipment rental markets by offering customers bundled deals on the sale of Standard Hospital Beds that "nobody else" could match.  As a result, Greisch candidly admitted that Hill-Rom was "investing a lot of time and resources into making sure that we're selling the breadth of that portfolio[.]"

65.    This new strategy has recently begun to bear fruit.  For example, between June and September 2014, Hill-Rom announced that it had entered into long-term, sole-source agreements with one of the largest GPOs, HPG/HCA, and one of the nation's largest hospital networks, Providence Health.  Each of Hill-Rom's bids for these contracts offered substantial financial incentives, including discounts and/or rebates, in return for an exclusive agreement to rent all or substantially all of their PHE and MME Rental needs from Hill-Rom.

66.    On or around June 14, 2014, Hill-Rom announced that HCA, a large hospital network with substantial market share nationally and in Florida and Texas, had awarded it a five-year agreement for PHE and MME Rentals, which included bariatric equipment, therapy surfaces, and additional MME products ("HCA Agreement").  This agreement replaced the separate multi-source agreements for PHE and MME Rentals that included both Universal and Hill-Rom as permissible suppliers.

67.     Two weeks later, on July 2, 2014, HPG, one of the largest GPOs in the country, announced that it had awarded a five-year PHE and MME Rental agreement to Hill Rom ("HPG Agreement").  This new agreement replaced the previous multi-source agreement that included both Universal and Hill-Rom as permissible suppliers, which expired on December 31, 2014.

68.     Finally, in July 2014, Hill-Rom announced that Providence Health, the third largest not-for-profit hospital network in the United States, had awarded it a ten-year, sole-source contract that bundled the sale of Standard Hospital Beds with PHE Rentals, and awarded a separate sole-source contract to Hill-Rom for MME rentals in September 2014 (collectively, the "Providence Agreements").

69.     Hill-Rom offered each of these customers significant discounts and/or rebates on Standard Hospital Bed purchases and PHE and MME Rentals conditioned on their consent to award Hill-Rom a sole-source contract for their PHE and MME Rental needs.

70.     As a result of these exclusionary bundling contracts, HPG, HCA, and Providence Health members effectively cannot rent PHE and MME products from Universal, regardless of the price, because the contracts require these customers to use Hill-Rom – and only Hill-Rom – to fulfill their rental equipment needs.

71.     On August 7, 2014, Hill-Rom announced third quarter results and once again boasted of its success in securing bundled agreements covering both "rental and capital products with several of the nation's leading health systems and group purchasing organizations, including Hospital Corporation of America (HCA) and HealthTrust."  Hill-Rom CEO John Greisch noted the boost that these agreements would provide to Hill-Rom and told investors that these exclusionary bundling agreements demonstrated the success of Hill's strategy.

72.     Hill-Rom plans to offer similar exclusionary bundling deals to other GPOs as soon as their current PHE and MME Rental agreements expire.  Losing additional contracts to even a few of these GPOs will have a severe effect on Universal's ability to remain viable in the PHE and MME Rental markets.

### THE ANTI-COMPETITIVE NATURE OF HILL-ROM'S
### SOLE-SOURCE, EXCLUSIONARY BUNDLING CONTRACTS

73.     Hill-Rom's strategy of leveraging its market power in the sale of Standard Hospitals Beds market to drive out competition in the PHE and MME Rental markets is anti-competitive and a violation of both federal and state antitrust law.  Indeed, it represents nothing more than a resumption and continuation of anti-competitive practices that a Western District of Texas jury has already decreed to be illegal and for which Hill-Rom has paid out over half a billion dollars.  For Hill-Rom, however, the ends have always justified the means.  By engaging in such conduct, Hill-Rom can not only protect its existing monopoly in Standard Hospitals Beds by eliminating potential new entrants, but it can also diversify, grow revenue, and increase market share by taking over the adjacent PHE and MME Rental markets.  Furthermore, by eliminating the growth of competitors in the PHE Rental market, Hill-Rom acts to prevent nascent competition in the Standard Hospital Bed sales market.

74.     Hill-Rom's contracts contain multiple terms that, standing alone, are anticompetitive.  But these terms in combination cause much greater harm, as the net result of a monopolist combining a discounted bundle and a sole-source agreement that includes its monopoly product is that it eliminates competition in the PHE and MME Rental markets.

75.     The first anticompetitive term in Hill-Rom's contracts is the bundled discounts for the sales of its Standard Hospital Beds with PHE and MME Rentals.  Customers can only get the discounts on the monopoly product, Standard Hospital Beds, if they agree to contract with Hill-

Rom for both PHE and MME Rentals and Standard Hospital Bed sales.  Similarly, any hospital network or individual hospital wishing to contract for just PHE and MME Rentals from Hill-Rom is not offered a discount.

76.    The conditional discounts and rebates offered by Hill-Rom are so steep that any competitor in the market for PHE or MME Rentals would be forced to price its own rental products below cost to be competitive with Hill-Rom's bundled pricing.  Indeed, the discounts and rebates are so steep that even a competitor offering its service for free would not be able to attract business from Hill-Rom in light of the bundled package it offers.  Thus, even equally (or more) efficient competitors are denied the opportunity to compete against Hill-Rom's bundled pricing scheme.

77.    Any hospital network or individual hospital wishing to both purchase Standard Hospital Beds and to rent PHE and MME products is effectively forced to agree to use Hill-Rom for its PHE and MME Rental needs because of the discounts and/or rebates that Hill-Rom offers on the more costly Standard Hospital Bed.

78.    Once all competitors are driven out of the rental market, Hill-Rom will be able to raise prices because GPOs and hospitals will have nowhere left to turn for their rental needs.

79.    Second, the sole-source nature of Hill-Rom's GPO contracts are exclusionary by definition.  Necessarily, under the terms of a sole-source agreement, the GPO members and hospital networks are not able to contract with any other competitor in the PHE and MME Rental markets.  As a result, they are deprived of choice.  They will only be able to rent the equipment Hill-Rom makes available.  And for PHE Rentals, Hill-Rom will only offer products that it manufactures.  As a result of Hill-Rom being the only practical option, doctors will not be able to

rent the equipment produced by other manufactures that they believe best serves each patient's needs.

80.    The exclusionary nature of GPO contracts is reinforced by commitment requirements and loyalty discounts contained therein.  Customers are substantially penalized if they go "off-contract" to purchase or rent medical equipment from other medical suppliers that are not approved under the operative supply agreements.

81.    The sole-source nature of the HCA, HPG, and Providence Agreements result in substantial foreclosure in the national and regional markets for PHE and MME Rentals.  For example, the exclusive nature of the HPG and  HCA Agreements alone foreclose competition in at least 12-15% of the national market and as much as 66% in regional markets where HPG/HCA have a large presence.

82.    If Hill-Rom's anticompetitive conduct is allowed to continue, Universal and other competitors will be substantially and quickly foreclosed from more and more of the market until Hill-Rom is able to eliminate substantially all competition.

83.    By offering anti-competitive discounts and/or rebates on the sales of Standard Hospital Beds—the market in which it is a monopolist—along with PHE and MME Rentals, Hill-Rom creates an irresistible bundle for its customers.  Ultimately, with these bundled prices, Hill-Rom is the only option for GPOs that need contracts for the purchase of Standard Hospital Beds and PHE and MME Rentals.

84.    If a substantial percentage of a regional market is foreclosed by Hill-Rom's monopoly leveraging and exclusionary bundling practices and no longer subject to competition for an extended period of time, then competitors will be forced to close, downsize, or consolidate regional distribution centers in those markets.  This will stretch their ability to reach customers

within the time-frames mandated by supply agreements.  Their smaller distribution networks will be stretched too thin to be a viable option for new PHE and/or MME Rental contracts once Hill-Rom's new HCA, HPG, and Providence Agreements expire.

85.     If increasingly large segments of the market are no longer subject to competition, it will also raise significant questions about competitors' future.  Hill-Rom will use these questions to instill fear, uncertainty, and doubt, which other GPOs and hospital networks will undoubtedly consider when awarding future contracts.

86.     The exclusivity of Hill-Rom's monopoly leveraging strategy combined with the deep, bundled discounts and/or rebates offered in Hill-Rom's contracts will create a cascade effect that will decrease competition in the market, reduce consumer choice, and ultimately increase prices for consumers.  This will ultimately result in Hill-Rom becoming a monopolist in yet another market.

## THE HARM TO COMPETITION CAUSED BY HILL-ROM'S MONOPOLY LEVERAGING AND EXCLUSIONARY BUNDLING STRATEGY

87.     Hill-Rom's monopoly leveraging and exclusionary bundling strategy has caused and will continue to cause substantial harm to Universal and competition in the PHE and MME Rental markets across the country.  Most of Hill-Rom's competitors are specialized companies that focus almost exclusively on renting a broad array of PHE and MME products that they purchase from multiple manufacturers.  As a result, these companies cannot profitably compete with Hill-Rom's bundled discounts across product lines since the combined discounts on sales and rentals are often greater than the entire price of the products that competitors like Universal rent.  In many cases, even if Universal rented the products for free, it could not "replace" the discount and rebates Hill-Rom customers would lose on Standard Hospital Bed purchases for being noncompliant with Hill-Rom's bundle.

88.     Hill-Rom is currently attempting to leverage additional commitments from other customers, including GPOs, through exclusive, sole-source bundling in anticipation of their current dual- or multi-source agreements with Universal, among others, expiring.  As a result, the percentage of the Relevant Markets blocked to Universal and other suppliers is likely understated and likely to expand rapidly over time.  Each additional customer that enters into a sole-source, bundled agreement with Hill-Rom further reduces the remaining PHE and MME Rental market available to Universal and other suppliers.  Ultimately, there is nothing stopping Hill-Rom from continuing to pursue its exclusionary and anti-competitive strategy as each current GPO contract expires and comes up for negotiation.

89.     Furthermore, no significant offsetting, pro-competitive efficiencies are created by Hill-Rom's use of below-cost and exclusionary bundling.  The rebates and discounts that Hill-Rom offers are not structured based solely upon the volume that a customer purchases or rents, but rather upon the extent to which a hospital or other customer agrees not to purchase or rent products from Hill-Rom competitors.

90.     Any short-term benefit that Hill-Rom's bundle creates by reducing the cost of medical equipment will be short-lived.  Hill-Rom's bundled pricing will continue to drive out competition in the PHE and MME Rental markets as Universal and other competitors are unable to match Hill-Rom's discounts and rebates.  This foreclosure will result in competitors downsizing regional distribution networks that are no longer profitable and eventually allow Hill-Rom to consolidate monopoly power in the rental markets.  And once Hill-Rom has obtained monopoly power, it will have the ability to begin charging monopoly prices that are substantially higher than its current bundled pricing to recuperate any losses it is currently suffering.

24

91.     Despite Hill-Rom's higher monopoly prices, competitors will remain foreclosed from competing for future GPO contracts because of the substantial barrier to entry that results from their diminished regional distribution networks.  National GPOs require suppliers to offer extensive distribution networks that can meet their time-sensitive delivery requirements.  But, rebuilding a delivery network that has been down-sized or consolidated requires a substantial investment of time and resources.  And even if Universal were able to rebuild a viable distribution network that met a GPO's requirements, its substantial investment of time and resources would necessitate charging higher prices to consumers than what would otherwise be competitive.  As such, Hill-Rom would be able to maintain its market power and customers in the industry would continue to be harmed by higher prices.

92.     Finally, customers will also be harmed by losing Universal's broad array of PHE and MME Rental products.  Choice of products is crucial for hospitals and medical professionals whose primary goal is to successfully care for patients.  Unlike Hill-Rom, UHS obtains and offers the best rental equipment in industry from multiple manufacturers.  Hill-Rom's PHE Rentals, on the other hand, are limited to the products that Hill-Rom manufactures, while its MME offerings fall far short of the catalog offered by Universal.  Hill-Rom's inventory, as a result, does not always include the latest technological advances or the best products for unique patient-care needs.  Thus, Universal's foreclosure from the rental market will result in customers losing high quality equipment and maintenance and management services that have become the gold standard for the PHE and MME Rental industry.

### HILL-ROM'S INTERFERENCE WITH EXISTING AND PROSPECTIVE ASSET MANAGEMENT SERVICE AGREEMENTS

93.     The asset management services market ("AMS") covers services—as opposed to equipment—that Hill-Rom and Universal provide to their customers.  Hospitals and medical

facilities have AMS agreements with suppliers to maintain, manage, and repair their medical equipment that is purchased or rented in the Relevant Markets.  Both Hill-Rom and Universal provide these services from their regional distribution centers, and often station employees at medical facilities who are dedicated to that facility's service and maintenance needs.

94.     AMS agreements are negotiated with individual medical facilities.   They generally are not governed by overarching supply agreements for Standard Hospital Beds, PHE or MME Rentals, or other medical equipment.

95.     Universal's AMS program is called Asset360® ("Asset360"), and Hill-Rom's AMS program is called AssetAdvantage™ ("AssetAdvantage").

96.     Universal has over 200 active Asset360 programs with hospitals and other medical facilities across the country.    Universal has established beneficial contractual relationships for asset management services with its customers.  In recognition of Universal's competitive prices and high-quality service, many Universal customers have privately expressed a strong desire to continue using Universal's Asset360 program despite being forced to purchase and rent medical equipment from Hill-Rom under the HPG or HCA Agreements.  In many instances, Universal has Asset360 agreements with customers who purchase or rent equipment from other medical equipment suppliers.

97.     In addition to Hill-Rom's anticompetitive and illegal conduct, which has harmed Universal's Asset360 program, Hill-Rom also has tortiously interfered with Universal's Asset360 programs across the country.

98.     According to a senior HPG executive, Hill-Rom's exclusive supply agreements with HCA and HPG for Standard Hospital Beds and PHE and MME Rentals do not cover asset management services.   This, however, has not stopped Hill-Rom from interfering with

Universal's Asset360 program.   Rather, Hill-Rom has intentionally misled current and/or prospective Asset360 customers by making false representations that Hill-Rom's new HPG and HCA Agreements require members to exclusively use Hill-Rom's AssetAdvantage program.

99.    Hill-Rom's actions have misled customers into believing that if they use Universal's Asset360 program, they will lose millions of dollars in rebates and discounts under the HPG and/or HCA Agreements.  Hill-Rom has done this by insinuating to customers that Hill-Rom will declare the customer "noncompliant" with its HPG and/or HCA Agreements if it uses Universal's Asset360 program.  If a customer is deemed noncompliant under those agreements, it stands to lose millions of dollars in compliance rebates and discounts.   The mere threat of having Hill-Rom report it as noncompliant with the HCA and HPG Agreements is enough to dissuade a customer from contracting with Universal because even though the actual terms of the HPG and HCA Agreements do not cover AMS programs, the customer cannot risk losing substantial rebates and/or discounts while it appeals Hill-Rom's designation.

100.    As a result, Hill-Rom can take full advantage of customers' confusion and/or misbelief that AMS programs are covered by the HCA and HPG Agreements.  This has directly interfered with and harmed Universal's Asset360 program.

101.    Shortly after the HCA Agreement was awarded to Hill-Rom, an HCA member informed Universal that HCA is cancelling all existing Asset360 contracts and will begin transitioning its member's business over to Hill-Rom's AssetAdvantage program.   HCA and HPG members followed HCA's lead.

102.    One potential Asset360 customer initially committed to using Universal's Asset360 program.  As the parties were finalizing the terms of the Asset360 contract, the HCA Agreement was announced with Hill-Rom.  A week later the customer informed Universal that

while it would like to use Universal's Asset360 program, there was no "wiggle room" with the noncompliance provision in the HCA Agreement, and cancelled its on-going Asset360 negotiations with Universal.

103.    Another HCA member who had a AssetAdvantage contract with Hill-Rom told Universal that it planned to let its AssetAdvantage contract expire, so it could join Universal's Asset360 program.  The customer and Universal were in the midst of advanced negotiations over an Asset360 contract, and had exchanged multiple redlines, when the customer received a letter from HCA's CFO directing it to cease-and-desist all on-going negotiations with Universal.  The letter explained that Universal's Asset360 program was not compliant with the new HCA Agreement.

104.    A Universal customer also recently declared that Hill-Rom is "beating down my door" about converting to Hill-Rom's AssetAdvantage program.  This same customer requested that Universal provide it with documentation showing that a hospital in an Asset360 agreement with Universal is not in violation of the HPG Agreement with Hill-Rom; otherwise, it said that it would have to cancel its current agreement due to pressure from Hill-Rom.

105.    Finally, a Universal customer recently announced that it was going to cancel its Asset360 contract because it understood that the Asset360 program was not compliant with Hill-Rom's new HPG Agreement.  It explained that Hill-Rom's rebates were worth tens-of-millions of dollars that it could not afford to give up.  Universal attempted to explain that asset management services are not covered under the HPG Agreement, but the customer concluded that it could not risk being noncompliant with the HPG Agreement.

106.    Hill-Rom's false representations and/or omissions intentionally and repeatedly targeted current and/or prospective Asset360 customers in an effort to win additional business for its AssetAdvantage service.

107.    Hill-Rom intentionally targeted and continues to target Universal's current and prospective Asset360 customers, thereby causing substantial harm to Universal and its Asset360 program.  Hill-Rom has been and remains aware that Universal had existing and/or prospective Asset360 contracts with these customers.  Hill-Rom specifically misled these customers and/or failed to correct their mistaken belief that the HCA and HPG Agreements covered AMS programs.  As a result, these customers canceled existing contracts and/or ceased advanced contract negotiations because they believed that they would be reported as noncompliant under Universal's Asset360 program and not qualify for the substantial discounts and rebates offered in Hill-Rom's supply agreements.

108.    Absent Hill-Rom's false statements and omissions, many of the hospitals would have maintained their existing Asset360 contracts and/or continued negotiating with Universal and entered into Asset360 contracts.

109.    Hill-Rom  likely  has  tortiously  interfered  with  additional  current  and/or prospective Asset360 customers that are not currently known and continues to make false representations and/or omissions about the HPG and HCA Agreements. Hill-Rom intends to cause these customers to terminate their contracts or advanced negotiations with Universal to further strengthen its AssetAdvantage program.

110.    The results of Hill-Rom's actions were and/or are foreseeable.  The cancellation of Asset360 contracts and/or advanced negotiations occurred directly as a result of its intentional and malicious conduct and omissions for that purpose.  Its actions and/or omissions were made

and undertaken with ill will for the purpose of harming Universal's Asset360 program.  The evidence will show that under such circumstances, Hill-Rom acted with malice and without privilege.

## DAMAGES

111.    As a result of Hill-Rom's anticompetitive and tortious conduct, Universal has lost and continues to lose market share in the PHE and MME Rental markets and current and prospective Asset360 customers.  Absent Hill-Rom's actions, Universal would have remained competitive in the PHE and MME Rental markets, and its current and prospective Asset360 customers would not have cancelled their contracts or terminated their on-going negotiations. The full amount, form, and components of such damages will be calculated after discovery and upon proof at trial.

## CAUSES OF ACTION

### COUNT I
### Monopolization of the Standard Hospital Bed Market
### in Violation of Section 2 of the Sherman Act
### (15 U.S.C. §2)

112.    Universal realleges paragraphs 1-111 as set forth above.

113.    The market for the sale of Standard Hospital Beds constitutes a relevant product market and the United States is the relevant geographic market.

114.    Hill-Rom possessed (and currently possesses) monopoly power in the market for the sale of Standard Hospital Beds in the United States.  Barriers to entry and barriers to expansion by existing firms are high in this market.  Hill-Rom, with at least a 70% share in the Standard Hospital Bed market in the United States, has the power to control prices and exclude competition in the market.

115.     Hill-Rom willfully and wrongfully obtained and/or maintained its monopoly in the sale of Standard Hospital Beds by engaging in the exclusionary, anti-competitive conduct set forth in the preceding paragraphs of this Complaint.

116.     The anti-competitive effects of Hill-Rom's conduct far outweigh any purported pro-competitive justifications.  Similarly, there are no legitimate business justifications for Hill-Rom's exclusionary conduct.  To the extent that there are any legitimate business reasons for Hill-Rom's restraints of trade, they are not the least restrictive means of achieving those business purposes.  Any claimed pro-competitive business reasons for Hill-Rom's restraints of trade are outweighed by the competitive harm that they have caused, and will cause, to competition in the Relevant Markets.

117.     Hill-Rom, through its exclusionary, anti-competitive conduct, has harmed consumers and impaired competition by, without limitation, depriving GPOs, hospital systems, and individual hospitals of choice, lower prices, and superior products and services, which healthy and fair competition would have provided.

118.     As a direct, foreseeable, and proximate result of Hill-Rom's exclusionary, anti-competitive conduct, Universal has suffered damages, including lost profits and the diminution in the value of its business, in amounts to be proven at trial.

**COUNT II**
**Attempted Monopolization of the PHE Rental Market**
**in Violation of Section 2 of the Sherman Act**
**(15 U.S.C. §2)**

119.     Universal realleges paragraphs 1-111 as set forth above.

120.     The PHE Rental market constitutes a relevant product market and the United States is the relevant geographic market.  Alternatively, PHE Rentals may be subject to regional geographic markets.

121.    Hill-Rom willfully and wrongfully attempted to obtain and maintain monopoly power in the PHE Rental market(s) in the United States by engaging in the exclusionary, anti-competitive conduct set forth in the preceding paragraphs of the Complaint.

122.    Hill-Rom acted with specific intent to monopolize the PHE Rental market(s). There is a dangerous probability that, if left unchecked, Hill-Rom will achieve its goal of obtaining monopoly power in the PHE Rental market(s).

123.    The anti-competitive effects of Hill-Rom's conduct far outweigh any purported pro-competitive justifications.  Similarly, there are no legitimate business justifications for Hill-Rom's exclusionary and predatory conduct.  To the extent that there are any legitimate business reasons for Hill-Rom's restraints of trade, they are not the least restrictive means of achieving those business purposes.  Any claimed pro-competitive business reasons for Hill-Rom's restraints of trade are outweighed by the competitive harm that they have caused, and will cause, to competition in the Relevant Markets.

124.    Hill-Rom, through its exclusionary, anti-competitive conduct, has harmed consumers and impaired competition by, without limitation, depriving GPOs, hospital systems, and individual hospitals of choice, lower prices, and superior products and services, which healthy and fair competition would have provided.

125.    As a direct, foreseeable, and proximate result of Hill-Rom's exclusionary, anti-competitive conduct, Universal has suffered damages, including lost profits and the diminution in the value of its business, in amounts to be proven at trial.

**COUNT III**
**Attempted Monopolization of the MME Rental Market**
**in Violation of Section 2 of the Sherman Act**
**(15 U.S.C. §2)**

126.    Universal realleges paragraphs 1-111 as set forth above.

127.     The MME Rental market constitutes a relevant product market and the United States is the relevant geographic market.  Alternatively, MME Rentals may be subject to regional geographic markets.

128.     Hill-Rom willfully and wrongfully attempted to obtain and maintain monopoly power in the MME Rental market(s) by engaging in the exclusionary, anti-competitive conduct set forth in the preceding paragraphs of the Complaint.

129.     Hill-Rom acted with specific intent to monopolize the MME Rental market(s). There is a dangerous probability that, if left unchecked, Hill-Rom will achieve its goal of obtaining monopoly power in the MME Rental market(s).

130.     The anti-competitive effects of Hill-Rom's conduct far outweigh any purported pro-competitive justifications.  Similarly, there are no legitimate business justifications for Hill-Rom's exclusionary and predatory conduct.  To the extent that there are any legitimate business reasons for Hill-Rom's restraints of trade, they are not the least restrictive means of achieving those business purposes.   Any claimed pro-competitive business reasons for Hill-Rom's restraints of trade are outweighed by the competitive harm that they have caused, and will cause, to competition in the relevant markets.

131.     Hill-Rom, through its exclusionary, anti-competitive conduct, has harmed consumers and impaired competition by, without limitation, depriving GPOs, hospital systems, and individual hospitals of choice, lower prices, and superior products and services, which healthy and fair competition would have provided.

132.     As a direct, foreseeable, and proximate result of Hill-Rom's exclusionary, anti-competitive conduct, Universal has suffered damages, including lost profits and the diminution in the value of its business, in amounts to be proven at trial.

**COUNT IV**
**Hill-Rom's Use of Exclusionary Bundling to Substantially Lessen**
**Competition in Violation of Section 3 of the Clayton Act**
**(15 U.S.C. §14)**

133.     Universal realleges paragraphs 1-111 as set forth above.

134.     Hill-Rom's use of exclusionary, bundled discounts in sole-source contracts with GPOs, hospital systems, and individual hospitals incorporating monopoly products (*i.e.* Standard Hospital Beds) deprives hospitals of choice by effectively preventing them from renting PHE and/or MME products from Universal and other competitors by the agreed-upon terms, commitment levels, bundled discounts, and below-cost pricing, either individually or in cumulative practical effect, incorporated in the contracts.

135.     Hill-Rom's use of exclusionary bundled discounts including monopoly products in sole-source GPO contracts substantially lessens competition and/or tends to create a monopoly in the PHE and MME Rental markets.

136.     The anti-competitive effects of Hill-Rom's conduct far outweigh any purported pro-competitive justifications.  Similarly, there are no legitimate business justifications for Hill-Rom's exclusionary and predatory conduct.  To the extent that there are any legitimate business reasons for Hill-Rom's restraints of trade, they are not the least restrictive means of achieving those business purposes.  Any claimed pro-competitive business reasons for Hill-Rom's restraints of trade are outweighed by the competitive harm that they have caused, and will cause, to competition in the Relevant Markets.

137.     Hill-Rom, through its exclusionary, anti-competitive conduct, has harmed consumers and impaired competition by, without limitation, depriving GPOs, hospital systems, and individual hospitals of choice, lower prices, and superior products and services, which healthy and fair competition would have provided.

138.    As a direct, foreseeable, and proximate result of Hill-Rom's exclusionary, anti-competitive conduct, Universal has suffered damages, including lost profits and the diminution in the value of its business, in amounts to be proven at trial.

**COUNT V**
**Hill-Rom's Use of Exclusionary Bundling in Violation of**
**Section 1 of the Sherman Act**
**(15 U.S.C. §1)**

139.    Universal realleges paragraphs 1-111 as set forth above.

140.    Hill-Rom has market power in the sale of Standard Hospital Beds market.

141.    Hill-Rom's use of exclusionary, sole-source contracts incorporating bundled discounts on monopoly products (i.e. Standard Hospital Beds) and strict commitment/loyalty requirements deprives hospitals of choice by effectively preventing them from renting PHE and/or MME products from UHS and other medical equipment rental providers by the agreed-upon terms, commitment levels, and bundled discounts, either individually or in cumulative practical effect, that are incorporated in the contracts.

142.    Each of Hill-Rom's exclusionary, sole-source contracts incorporating bundled discounts on monopoly products (i.e. Standard Hospital Beds) and strict commitment/loyalty requirements are anti-competitive and represent a contract, combination and/or conspiracy within the mean of Section 1 of the Sherman Act.

143.    Hill-Rom's use of exclusionary, sole-source GPO contracts incorporating bundled discounts on monopoly products (i.e. Standard Hospital Beds) and strict commitment/loyalty requirements is specifically intended to foreclose competition in the PHE and MME Rental markets and to willfully and wrongfully obtain and maintain monopoly power in those markets. The contracts achieved the purposes for which they were undertaken, substantially foreclosed a substantial share of the PHE and MME Rental markets, and unreasonably restrained trade.

144. The anti-competitive effects of Hill-Rom's conduct far outweigh any purported pro-competitive justifications. Similarly, there are no legitimate business justifications for Hill-Rom's exclusionary and predatory conduct. To the extent that there are any legitimate business reasons for Hill-Rom's restraints of trade, they are not the least restrictive means of achieving those business purposes. Any claimed pro-competitive business reasons for Hill-Rom's restraints of trade are outweighed by the competitive harm that they have caused, and will cause, to competition in the Relevant Markets.

145. Hill-Rom, through its exclusionary, anti-competitive conduct, has harmed consumers and impaired competition by, without limitation, depriving GPOs, hospital systems, and individual hospitals of choice, lower prices, and superior products and services, which healthy and fair competition would have provided.

146. As a direct, foreseeable, and proximate result of Hill-Rom's exclusionary, anti-competitive conduct, Universal has suffered damages, including lost profits and the diminution in the value of its business, in amounts to be proven at trial.

**COUNT VI**
**Texas Antitrust Law Violations**

147. Universal realleges paragraphs 1-111 as set forth above.

148. Hill-Rom entered into agreements with hospitals in Texas that unreasonably restrained trade and commerce in violation of Texas statutory and common law prohibitions against the unreasonable restraints of trade.

149. Hill-Rom has monopolized, attempted to monopolize, and conspired to monopolize trade and commerce in violation of Texas statutory and common law prohibitions against monopolizing any part of trade or commerce.

150. As a result of Hill-Rom's unreasonable restraint of trade, monopolization, and attempt to monopolize, Universal has been injured in its business and property.

## COUNT VII
## Tortious Interference with Business Relationships

151. Plaintiff realleges paragraphs 1-111 as set forth above.

152. Hill-Rom interfered with Universal's business relations, including its existing and/or prospective business contracts.

153. Hill-Rom had actual knowledge of the existence of Universal's contracts and its interest therein, or knowledge of facts and circumstances that would lead a reasonable person to know of their existence. Hill-Rom has willfully and intentionally committed acts that were calculated to, and did as a result of the interference, cause damage to Universal in its lawful business. Hill-Rom's acts were the proximate cause of actual damage and loss to Universal.

154. Hill-Rom has also acted intentionally and unlawfully without privilege or justification in a manner that has interfered with Universal's prospective business relations, and/or has prevented Universal from entering into business contracts where a reasonable probability existed that the contracts would have been entered into but for Hill-Rom's interference. Hill-Rom's intentional, unlawful, and unexcused interference with Universal's ability to enter into business relations and business contacts with potential healthcare providers was the proximate cause of actual injury and special financial damage to Universal.

155. Because of the knowing, malicious or reckless nature of its conduct, Hill-Rom is liable for punitive damages.

## COUNT VIII
## Injunctive Relief

156. Plaintiff realleges paragraphs 1-111 as set forth above.

157.    Unless Hill-Rom is enjoined, its unlawful agreements will continue to cause anticompetitive injury to competition in the PHE and MME Rentals markets, to Universal, and other competitors in those markets, and to GPOs, hospital systems, and individual hospitals.

158.    Hill-Rom has engaged in a continuing pattern and practice of illegal acts that are likely to recur unless it is permanently enjoined from engaging in such unlawful conduct in the future.

159.    Undoing the anticompetitive effects of Hill-Rom's agreements also requires permanently enjoining Hill-Rom from entering into such agreements.

160.    Denying Hill-Rom the fruits of its unlawful agreements and acts requires enjoining it to disgorge any profits it reaped by its illegal agreements and conduct.

161.    Universal seeks an injunction enjoining Hill-Rom from continuing the unlawful conduct alleged herein, from entering into any other agreement or employing similar anticompetitive strategies that have similar purposes and effects, and requiring Hill-Rom to disgorge any profits it earned through such unlawful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Universal respectfully requests that the Court adjudge and decree that:

- Hill-Rom engaged in unlawful acts in violation of Sections 1 and 2 of the Sherman Act, Sections 3 and 16 of the Clayton Act, and/or the common laws of the various states;

- Hill-Rom's exclusionary bundling agreements with HPG and HCA do not cover asset management services;

- Universal be awarded actual damages, including, without limitation, lost profits;

- Universal be awarded three-fold the damages (or the maximum amount of damages available under applicable law) that it is determined to have sustained pursuant to Section 4 of the Clayton Act;

- Universal be awarded punitive damages;

38

- Universal be awarded pre- and post-judgment interest on any actual, treble, and/or punitive damages award;

- Universal recover its costs of suit, including reasonable attorneys' fees and costs as provided by law;

- Hill-Rom be required to disgorge any profits gained by the illegal conduct;

- Hill-Rom be enjoined from continuing its anticompetitive conduct;

- Universal be granted prospective relief to promote competition and any other appropriate relief as may be determined to be just, equitable, and proper by this Court in light of Hill-Rom's recidivism and long history of antitrust violations; and

- Universal be granted any other appropriate relief as may be determined to be just, equitable, and proper by this Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

## NOTICE

As required by Section 15.21(c) of the Texas Business and Commerce Code, a copy of the original complaint was mailed to the Attorney General of the State of Texas.

Dated: January 13, 2015

Respectfully submitted,

*/s/ R. Laurence Macon*
R. LAURENCE MACON
Texas Bar No. 12787500
lmacon@akingump.com
JANIE A. SHANNON
Texas Bar No. 00797416
jshannon@akingump.com
**AKIN GUMP STRAUSS HAUER & FELD LLP**
300 Convent Street, Suite 1600
San Antonio, TX 78205
Tel: (210) 281-7000
Facsimile: (210) 224-2035

*Of Counsel:*

RICHARD L. WYATT, JR.
D.C. Bar No. 424775
rwyatt@hunton.com
RYAN P. PHAIR
D.C. Bar No. 479050
rphair@hunton.com
**HUNTON & WILLIAMS LLP**
2200 Pennsylvania Avenue, NW
Washington, DC  20037
Tel:  (202) 955-1500
Facsimile:  (202) 778-2201

**ATTORNEYS FOR PLAINTIFF**